[Nos. 31636-6-II; 31646-3-II.   Division Two.   March 21, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS JOHN MARTIN TOBIN, *Appellant*.

162

*Mary Katherine Young High*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Michelle Luna-Green* and *Kathleen Proctor, Deputies*, for respondent.

*Robert M. McKenna, Attorney General*, and *Joseph V. Panesko, Assistant*, on behalf of Department of Natural Resources, amicus curiae.

¶1 ARMSTRONG, J. — Douglas John Martin Tobin appeals the superior court's restitution order against him for stealing crabs and geoducks from the state of Washington and Native American Tribes. He argues that (1) the declarations the expert used to estimate damages failed to meet the requirements of RCW 9A.72.085, (2) the expert did not assess damages with reasonable certainty, (3) the investigative and administrative costs the court included in the order were not sufficiently related to Tobin's criminal activity, and (4) the State had no interest in the geoducks and should not have been awarded restitution for them. We affirm, holding that Tobin waived any technical defect in the declarations; that the State proved damages with reasonable certainty; that the State was entitled to recover its investigative and administrative costs; and that the court properly awarded restitution to the State, to be allocated by agreement with the Native American Tribes.

## FACTS

¶2 In 2002, authorities charged Douglas John Martin Tobin with 1 count of leading organized crime; 10 counts of first degree trafficking in stolen property; 27 counts of first degree theft; and 1 count of first degree conspiracy to commit theft. These charges concerned the illegal harvest

and sale of geoducks from January 2000 to March 2002 (the geoduck case[1]).

¶3 Soon after, authorities charged Tobin by second amended information with 33 counts of first degree violation of commercial area or time; 33 counts of unlawful trafficking in fish or wildlife; 1 count of first degree engaging in fish dealing activity unlicensed; 1 count of first degree commercial fishing without a license; and 33 counts of failure to report commercial fish, shellfish harvest, or delivery. These charges concerned the illegal harvest and sale of crabs from June 1, 2000, to February 5, 2002 (the crab case[2]).

¶4 Tobin pleaded guilty to first degree theft in the geoduck case. In exchange, the State dropped the remaining 38 counts and informed Tobin that it would seek an exceptional sentence and request $1.2 million in restitution. Tobin also pleaded guilty to various charges in the crab case. The State advised him it would request an exceptional sentence and seek $300,000 in restitution.

¶5 At the restitution hearing, the State sought restitution for 196,412 pounds of geoducks; $15,000 for the expense of hiring an extra secretary half-time in order to manage the evidence; $47,000 for the forensic accountant; and $70,000 for the resurvey of the illegally harvested tracts. The State argued that these costs were a direct result of Tobin's actions. In the crab case, the State sought $198,305.20 for 72,594 pounds of crab. The State also requested costs of $42,000 for three patrol vessels that had to go out and look for crab pots that were on the bottom of the Puget Sound in the Nisqually area, and $7,500 for the screen radon, which was used to locate the pots.

¶6 At the restitution hearing, the trial court heard arguments from the parties, but it took no testimony. Instead, it considered the State's memorandum regarding restitution, which included the declarations of (1) Detective

---

[1] Superior Court Cause No. 02-1-05810-0.

[2] Superior Court Cause No. 02-1-01236-3.

Edward Volz of the Washington Department of Fish and Wildlife (WDFW); (2) Kevin Harrington, also a WDFW detective; (3) William Omaits, a forensic accountant; (4) Bob Sizemore, a WDFW biologist; and (5) Wayne Palsson, a WDFW research scientist. The court also considered Tobin's memorandum and two supplemental memoranda on restitution, as well as a declaration response to the declaration of Ian Child, and a declaration from Jeff Abulet, co-owner of Clear Bay Seafoods. Tobin did not object to the State's declarations.

¶7 The court adopted Omaits's calculations and found that the loss to the State for the value of the geoducks was $764,408.40. It also found that Tobin was responsible for $198,305.20, the value that he received for the crab. And the court found the various investigation and administrative damages to be $15,000; $30,000; $70,000; $42,000; and $7,500.

¶8 Accordingly, the court ordered $879,408.40 in restitution in the geoduck case, with the funds to be distributed to the State, to be allocated by agreement among the State and the Nisqually, Squaxin, and Puyallup Indian Tribes. The court ordered $247,803 in restitution in the crab case, with the funds to be allocated by agreement between the State and the Nisqually Indian Tribe.

¶9 We have consolidated the cases on appeal.

## I. The Geoduck Case

¶10 Tobin ran a fishing organization that illegally harvested geoduck clams belonging to the state of Washington and the Puyallup, Nisqually, and Squaxin Indian Tribes. As a harvester and seller of shellfish, Tobin was required to fill out a fish ticket each time he harvested geoducks. Fish tickets must be filed with the WDFW, which then uses the information from the fish tickets to manage the resource, to set seasons, and to establish quotas. Tobin did not file any fish tickets on the geoducks he harvested.

¶11 Tobin and his employees did all of the illegal harvesting at night to avoid being detected by authorities.

After harvesting the clams, Tobin transported them to his packing plant, Toulok Seafoods, in Fife, Washington. Then he sold the stolen clams to various shellfish processors in Canada, California, and Washington.

¶12 Tobin employed many people in his organization, including divers, packers, and a pilot for the boat. Xiang (Jack) Li, owner of Five Oceans and Daisun, acted as a middle man and paid cash for the geoducks, which he shipped to processors in California during the period of June 10, 2001, to March 18, 2002. 1 Clerk's Papers (CP) 21. Toulok's invoices to Daisun corroborate Li's purchases from Toulok. Li stated that after December 2, 2001, Tobin began to send invoices directly to Ocean Harvesters for the product that Li purchased from Tobin. Carl Chau, owner of Ocean Harvester, claims he made payments for the geoducks by making direct deposits into Li's bank accounts. Ocean Harvester's records and witness statements corroborate his claims.

¶13 Agents from the WDFW served a search warrant on Tobin's business, Toulok, and after reviewing the documents they seized, they determined the location where he sold the illegal geoducks. Then the agents obtained search warrants for the named seafood and shellfish outlets and served the warrants on those businesses. Using the documents they seized, including air bills, invoices, fish tickets, checks, and deposits, the agents determined the amount of geoducks illegally harvested and sold by Tobin from January 2000 through March 18, 2002.

## II. The Crab Case

¶14 In June 2000, the WDFW received complaints from several citizens that a large commercial fishing boat was taking crab from the Nisqually Delta area. At the time, the State did not allow commercial crab harvesting below the Tacoma Narrows Bridge. The Nisqually Delta area is "within the Usual and Accustomed Fishing Grounds of the Nisqually Indian Tribe." CP (Aug. 27, 2004) at 153. The

Nisqually Tribe, however, had no commercial crab season. Citizen complaints described a large boat named *Typhoon*, which WDFW detectives knew Tobin owned. CP (Aug. 27, 2004) at 153.

¶15 After putting the *Typhoon* under surveillance, WDFW detectives watched as the crew loaded the boat with fishing gear at night and returned in the morning with crabs or geoducks or both. WDFW detectives interviewed many of Tobin's former and current employees, who confirmed that Tobin was crab fishing in the Nisqually Delta area.

¶16 Tobin filed no fish tickets with the WDFW for the crab that he harvested from the Nisqually Delta area.

### III. Evidence of Damages

¶17 Through the criminal investigation and accounting in this case, detectives executed search warrants at Bank of America in Fife; Norcal; Ocean Harvesters; Dakon Foods; Wong Tung; Green Valley Meats; Ranch 99 Markets; Daisun International; Toulok Seafoods; and Tobin's residence, vehicles, and vessels. Clear Bay Seafoods also voluntarily released sales and purchases records to a detective. The evidence obtained revealed sales, invoices, and deposited checks as payment for geoducks and/or crabs by the three California markets (Ocean Harvesters, Dakon Foods, and Norcal), as well as the Canadian market (Clear Bay Seafoods), a market in Oregon, and Washington markets.

¶18 The State hired expert William Omaits, a Washington licensed private investigator "specializing in Forensic Accounting and Financial Investigations," to examine this evidence and estimate the total pounds and sales value of stolen geoducks and crabs. CP (Oct. 12, 2004) at 91-92. Omaits has an extensive background in criminal investigations, having served as a criminal investigator assisting the United States Attorney's Office in "numerous Task Force investigations, conducted jointly with the [Federal Bureau

of Investigation], Postal Inspectors, U.S. Customs, and other Federal, State, and Local law enforcement agencies." CP (Oct. 12, 2004) at 91. Many of these investigations included income calculations "determined from incomplete or inaccurate financial records." CP (Oct. 12, 2004) at 91. He also reported that he had testified "extensively before Federal Grand Juries and in criminal trials as case agent and government witness explaining complex financial transactions and computations." CP (Oct. 12, 2004) at 91.

¶19 Omaits's analysis showed that Tobin and his conspirators "conservatively stole" 196,412 pounds of geoduck and 73,615 pounds of crab. He used two different methods to show damages to the State; he was able to use one method for both geoduck and crab and the other just for geoduck.

¶20 Using the first method, he valued the stolen geoducks at $1,272,846.03 and the stolen crab at $198,305.20. These estimates were based on sales invoices, sales records, and witness statements. Using the second method, he estimated the geoduck losses at $764,408.40, the amount Tobin would have paid had he legally purchased the geoducks at Washington Department of Natural Resources (DNR) south Puget Sound geoduck auction prices. This value was determined by multiplying the net stolen monthly pounds by the bid price closest in time to the appropriate harvest period. DNR does not auction crab; thus, the value of crab is the value a harvester receives for them. The court adopted the estimation from the second method for the geoduck damages.

¶21 Omaits explained that most of the sales invoices in this case were secured from Toulok records during execution of the search warrant and investigation. He admitted that these invoices were "at best, incomplete." CP (Oct. 12, 2004) at 92. When an invoice was unavailable for geoduck, he used the purchaser's sales invoice to the subsequent buyer to determine the price per pound and dollar value for Toulok. When airway freight bills were the only evidence available to document sales to customers, Omaits deter-

mined that 10 to 15 percent of the total weight included packing and shipping boxes. He claimed that the number of estimated sales invoices he used to determine the total pounds and dollar value of stolen geoducks was 25 percent of the total. The remaining 75 percent came from actual Toulok sales invoices.

¶22 When an invoice was unavailable for crab sales, the "price per pound and pounds sold were 'backed into' " by a combination of statements from purchasers and their cancelled checks deposited into the Toulok checking account. CP (Oct. 12, 2004) at 93, 94. In other instances, Omaits used the same techniques he used for estimating geoduck sales and poundage. Omaits claimed that the total number of estimated calculations used to determine the total pounds and dollar amount of poached crab was 21 percent, and the remaining 79 percent came from actual Toulok sales invoices and/or the sales journal.

¶23 Omaits also considered additional documents and witness statements from Stacey Tobin; Julian Ng and Jeff Abulet of Clear Bay Seafoods in Vancouver, British Columbia; Jack Li; Bill Shu of Five Oceans Seafood in El Toro, California; former Toulok employees; co-defendants; and others. He used those witness statements, along with DNR south Puget Sound geoduck auction prices, to estimate some of the dollar values of damages to the State.

¶24 Omaits stressed that when making his estimations, he used "[g]enerally accepted accounting principles and conservative number calculations." CP (Oct. 12, 2004) at 91. For example, the poundage total that he derived did not include the 64,577 pounds of geoduck that Toulok purchased on fish tickets from other Native American harvesters, and it did not include the 45,802 pounds of crab purchased from other native and nonnative crab harvesters.

¶25 In addition, Volz reported that WDFW costs for the investigation were approximately $442,850. He asserted that two WDFW detectives spent about 75 percent of their time on the Tobin case for 18 months ($196,000); one

WDFW detective spent about 60 percent of his time for 12 months ($57,000); one WDFW detective spent about 40 percent of his time for 18 months ($45,600); and two other detectives spent about 20 percent of their time for 12 months ($19,000), for a total WDFW detective cost of $317,600.

¶26 He also outlined other expenses as follows:

Approximately 55 Fish and Wildlife Officers (wages and travel) who participated on March 17 and 18, 2002 for warrant executions and arrests, etc., representing a cost of about $19,250.

A contract with Innerspace Exploration (side scan sonar) to locate and recover the crab pots in the Nisqually Delta at a cost of $7,500.

The costs for 5-10 Officers and 3 patrol vessels . . . who participated in the recovery efforts of 106 of the crab ports [sic] that Tobin used to commercial fish for crab, a cost of about $42,000.

Travel for one WDFW detective to California to execute warrants at the three California businesses who purchased Tobin's illegal geoduck, a cost of $1500.

The hiring of a secretary (1/2 time) to manage the documentary evidence, $15,000.

The costs of Forensic Accountant Bill Omaits, $30,000.

Storage and transportation costs of evidence (boats, vehicles, etc.) of seized items including boats and vehicles, $10,000.

CP (Oct. 12, 2004) at 126-27.

## ANALYSIS

### I. Declarations under RCW 9A.72.085[3]

¶27 Tobin argues that the State's declarations failed to meet the requirements of RCW 9A.72.085.[4] Specifically, he

---

[3] Tobin cites RCW 9A.75.085, which does not exist, but he appears to mean RCW 9A.72.085.

[4] RCW 9A.72.085 states the following, in part:

Whenever, under any law of this state or under any rule, order, or requirement

maintains that the declarations are legally insufficient because they fail to state the date and place of execution; in fact, *all include the date.* The State counters that Tobin's argument overlooks that (1) Tobin failed to object to the admission of the declarations below, (2) the rules of evidence do not apply at restitution hearings, and (3) a mere technical defect in a declaration does not affect its admissibility in a restitution hearing. We agree with the State.

¶28 We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004) (citing *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990)); *Reese v. Stroh*, 128 Wn.2d 300, 310, 907 P.2d 282 (1995). Thus, we will reverse only if the decision is one "no reasonable person would have decided . . . as the trial court did." *Thomas*, 150 Wn.2d at 856 (citing *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997)). Furthermore, "[p]roper objection must be made at trial to perceived errors in admitting or excluding evidence and failure to do so precludes raising the issue on appeal." *Thomas*, 150 Wn.2d at 856 (citing *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985)).

¶29 The hearing record shows no objection from Tobin about the form of any of the State's declarations. And his numerous memoranda to the court include no argument about the form of the declarations. Because Tobin failed to object below, we decline to review this issue.

---

made under the law of this state, any matter in an official proceeding is required or permitted to be supported, evidenced, established, or proved by a person's sworn written statement, declaration, verification, certificate, oath, or affidavit, the matter may with like force and effect be supported, evidenced, established, or proved in the official proceeding by an unsworn written statement, declaration, verification, or certificate, which:

(1) Recites that it is certified or declared by the person to be true under penalty of perjury;

(2) Is subscribed by the person;

(3) States the date and place of its execution; and

(4) States that it is so certified or declared under the laws of the state of Washington.

## II. Reasonable Certainty of the Damages

¶30 Tobin argues that the State relied on unsupported and unreliable evidence; thus, the court's award of restitution was an inaccurate reflection of the damages.

■■ ¶31 Under RCW 9.94A.753(3):

[R]estitution ordered by a court pursuant to a criminal conviction *shall be based on easily ascertainable* damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury. . . . The amount of restitution shall not exceed double the amount of the offender's gain or the victim's loss from the commission of the crime.

(Emphasis added.)

¶32 "Easily ascertainable" damages are tangible damages supported by sufficient evidence. *State v. Bush*, 34 Wn. App. 121, 123, 659 P.2d 1127 (1983). But "[c]ertainty of damages need not be proven with specific accuracy." *State v. Pollard*, 66 Wn. App. 779, 785, 834 P.2d 51 (1992) (citing *State v. Mark*, 36 Wn. App. 428, 434, 675 P.2d 1250 (1984)); *see also Bush*, 34 Wn. App. at 124. Instead, Washington courts have held that " '[o]nce the fact of damage is established, the precise amount need not be shown with mathematical certainty.' " *Bush*, 34 Wn. App. at 124 (quoting *Haner v. Quincy Farm Chems., Inc.*, 29 Wn. App. 93, 97-98, 627 P.2d 571 (1981), *aff'd in part and rev'd in part on other grounds*, 97 Wn.2d 753 (1982)); *see also Pollard*, 66 Wn. App. at 785; *Mark*, 36 Wn. App. at 434.

■■ ¶33 A trial court has discretion to determine the amount of restitution. *Pollard*, 66 Wn. App. at 785 (citing *Mark*, 36 Wn. App. at 433). We will find an abuse of discretion only if the decision is " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *Pollard*, 66 Wn. App. at 785 (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). For example, if the amount of damages is shown by " 'substantial credible evidence,' " the trial court did not abuse its discretion. *Pollard*, 66 Wn. App. at 785 (quoting *Mark*, 36

Wn. App. at 434). In short, the restitution statute allows the trial court considerable discretion in determining restitution, "which ranges from none (in some extraordinary circumstances) up to double the offender's gain or the victim's loss." *State v. Kinneman*, 155 Wn.2d 272, 282, 119 P.3d 350 (2005). Nor does the statute require that "the restitution ordered must be equivalent to the injury, damage or loss, either as a minimum or a maximum." *Kinneman*, 155 Wn.2d at 282. Finally, the State need prove damages only by a preponderance of the evidence. *Kinneman*, 155 Wn.2d at 285.

## 1. Was There a Reasonable Basis for the Estimation of Damages?

¶34 Tobin argues that the estimate of damages Omaits provided was not sufficiently accurate to establish the State's loss. He posits that damages "must not be based on mere conjecture or speculation," and he suggests that by accepting Omaits's estimate of the damages, the court violated this principle. Br. of Appellant at 8.

■ ¶35 But Washington courts allow *estimated* damages in restitution cases. *See, e.g., State v. Awawdeh*, 72 Wn. App. 373, 379, 864 P.2d 965 (1994); *Bush*, 34 Wn. App. at 123; *Mark*, 36 Wn. App. at 434; *Pollard*, 66 Wn. App. at 785. Specifically, "the evidence of damages must be sufficient to afford a *reasonable basis for estimating* the loss and must not subject the trier of fact to mere speculation or conjecture." *Awawdeh*, 72 Wn. App. at 379 (emphasis added) (citing *Pollard*, 66 Wn. App. at 785); *see also Bush*, 34 Wn. App. at 124 (stating that "[e]vidence of damage is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture"); *and see Haner*, 29 Wn. App. at 97-98. The question is not whether Omaits *estimated* the damages, it is whether he derived his estimates from a *reasonable basis* that did not require the trial judge to speculate or conjecture as to the appropriate restitution.

¶36 Here, Omaits reported his extensive investigation, which included reviewing invoices and other sales records, both from Tobin's company and his product purchasers, witness statements, and airway freight bills; the State also presented numerous supporting declarations given under penalty of perjury.[5] We conclude that the evidence was more than adequate to support Omaits's estimates and the trial court's restitution awards.

¶37 Importantly, Tobin was running an illegal operation for which he did not keep complete and accurate business records. The legislature has expressed "a strong desire that offenders must pay restitution to the victims of their crimes." *State v. Johnson*, 69 Wn. App. 189, 193, 847 P.2d 960 (1993). Thus, "[s]tatutes authorizing restitution should not be given 'an overly technical construction which would permit the defendant to escape from just punishment.' " *Johnson*, 69 Wn. App. at 193 (quoting *State v. Davison*, 116 Wn.2d 917, 922, 809 P.2d 1374 (1991)); *State v. Mead*, 67 Wn. App. 486, 490, 836 P.2d 257 (1992). Tobin should not escape paying restitution simply because he failed to keep detailed and accurate records of his criminal activities.

¶38 But Tobin argues that Omaits's estimates of 21 percent and 25 percent are "too significant to support an award and as such render the award speculative and conjectural," citing *In re Marriage of Muhammad*, 153 Wn.2d 795, 108 P.3d 779 (2005). Br. of Appellant at 8. *Muhammad* is not a criminal restitution case; it concerned the property division a trial court ordered during a marriage dissolution. *Muhammad*, 153 Wn.2d at 797.

¶39 There, approximately $8,200 (21 percent) of the husband's $38,400 pension was accumulated during the 20-month premarriage cohabitation of the parties. *Muhammad*, 153 Wn.2d at 799. But the trial court declined to divide that $8,200, awarding it entirely to the husband on the grounds that the amount was "minimal." *Muhammad*, 153 Wn.2d at 799-800. The Supreme Court reversed, comment-

---

[5] *E.g.*, Decl. of Bob Sizemore; Decl. of Edward Volz; Decl. of Kevin Harrington; Decl. of Wayne Palsson; and Decl. of William Omaits.

ing that few people would think half of \$8,200 to be minimal. *Muhammad*, 153 Wn.2d at 804.

¶40 *Muhammad* is not helpful. Omaits did not disregard 21 percent of any amount here. Rather, he was unable to locate Tobin's sales invoices for 21 percent of the crab sales and 25 percent of the geoduck sales. He, therefore, reconstructed the sales amounts from purchasers' records and air freight bills. Each method supports a reasonable estimate for the amount of missing sales invoices.

## 2. Were the Estimates Reasonably Accurate or Easily Ascertainable?

### A. Lawfully Harvested Geoducks

¶41 Tobin also argues that Omaits's declaration was insufficient to establish "easily ascertainable" damages. Br. of Appellant at 8. For example, he argues that Omaits did not distinguish between *lawfully harvested* and *stolen* shellfish that were shipped by air freight. He complains that Omaits "simply concluded that all air freight shipments of shellfish for which he could not find other sales documentation was stolen." Br. of Appellant at 8. As support for this assertion, he cites to Jeff Abulet's declaration.[6] Yet neither Tobin's brief nor Abulet's declaration identify any precise or estimated amount of supposedly legally harvested shellfish sent by air freight. Furthermore, in Volz's declaration, Volz stated that "to ensure accuracy, all questionable Tobin sales records of shellfish were excluded from analysis." CP (Oct. 12, 2004) at 126. And once the fact of damage is established, the precise amount need not be shown with "mathematical certainty," *see Bush*, 34 Wn. App. at 124; the State need prove the damages at an evidentiary hearing only by a *preponderance of the evidence, Kinneman*, 155 Wn.2d at 285. Tobin has not shown that the State failed to meet its burden or that the lower court's decision was manifestly

---

[6] In fact, Abulet does not state anywhere in his declaration that *any* sales from Toulok to Clear Bay were legal. His declaration lends no support to Tobin's argument.

unreasonable, or exercised on untenable grounds, or for untenable reasons.

B. Clear Bay Shipping to Tobin

¶42 Tobin also argues that the record does not support the assumption that Clear Bay would not ship products to Tobin and that calculations based on this assumption are not appropriate. He stresses that Abulet stated in his declaration that "[o]n occasion, for various reasons, Clearbay [sic] Fisheries would send geoduck product to Seattle over the Canadian border to the Toulok [Tobin] plant for shipment to customers in various parts of the United States." CP (Aug. 27, 2004) at 232. Notably, Abulet did not provide the "various reasons" or elaborate on this statement.

¶43 In contrast, Harrington stated:

[T]here is circumstantial evidence of the common business practices in the geoduck industry that indicates the geoduck invoiced by Clear Bay and shipped from Sea Tac had originated in Washington. There would be no logical reason for Clear Bay, who has their own processing plant in Vancouver[, British Columbia], to pay to have their geoduck driven across the border two hundred miles to Tacoma Washington to be packed by Toulok and then shipped from Sea-Tac airport. The geoduck market is a live market and the time lost alone, not to mention the extra transportation costs incurred, would make this a totally impractical business practice. In all of my experience investigating the geoduck industry, including extensive work examining airline records, I am not aware of a single instance of a Canadian company transporting geoduck harvested in Canada to Sea/Tac Airport.

CP (Oct. 12, 2004) at 58.

¶44 Furthermore, Julian Ng, co-owner of Clear Bay, told Harrington that Clear Bay would either pick up the product themselves from the Toulok plant or they would have the product delivered by Tobin or a freight forwarder. And Stacey Tobin, Tobin's daughter and employee, told Harrington that "[Toulok] never packed any geoduck for Clear Bay." CP (Oct. 12, 2004) at 68.

¶45 In addition, Ng recalled that sometimes Tobin would fill orders for Clear Bay customers by shipping his geoducks from Sea-Tac airport to Clear Bay's customers as directed by Clear Bay. In those cases, the invoice would be made out to the Clear Bay customer. The air bills for these transactions listed Toulok as the shipper and the product point of origin as Sea-Tac airport. Harrington testified that there are corresponding air bills for each of these shipments and the dates and amounts of product are the same as on the Clear Bay invoice.

¶46 Carl Chau, owner of Ocean Harvester, told Harrington that in 2001, he purchased geoduck from Five Oceans. He said that all of the Five Oceans' invoices that bore the initials C.B. (standing for Clear Bay) were for geoducks shipped by Toulok at the direction of Clear Bay. He claimed that the geoduck boxes contained health tags indicating that Toulok was the original source and that the geoducks were a Washington product.

¶47 Thus, the State produced persuasive evidence that Tobin never shipped legal product. In any event, the Abulet affidavit conflicts with the evidence that the trial judge resolved against Tobin. The court properly made a credibility determination between the conflicting evidence.

### C. Li's Mark-Up and his Motive

¶48 Tobin also argues that Omaits's calculations do not account for the fact that Li was a middleman who included a markup in his sales price and that by calculating the geoduck poundage from these deposits, Omaits's approach overestimates the amount of geoduck because it calculates the poundage based on deposits that include a markup. This argument fails because the court adopted the Omaits's geoduck estimation that relied solely on evidence of poundage; Omaits relied on price when he used the "backing into" method for estimating crab sales, not the geoduck sales.

¶49 Tobin also argues that the information in Harrington's declaration was unreliable because Li had a personal motive to shift blame and curry favor with the government

in hopes of avoiding or lessening his own potential punishment for his own crimes. Even if Li did have such a personal motive, his story was corroborated by invoices, health tags, Ocean Harvester records, bank deposit slips, and statements from Chau.

### 3. Investigative and Administrative Costs

¶50 Tobin contends that the trial court erred by including investigative and administrative costs in the restitution order because "the State did not *prove* the costs and because the costs were not *sufficiently related* to Mr. Tobin's actions." Br. of Appellant at 12 (emphasis added). He contends that nowhere does Volz support his estimations with any supporting documentation, such as time sheets, pay stubs, or similar corroborating information.

¶51 Restitution is proper when a causal connection exists between the crime and the injuries for which compensation is sought. *State v. Vinyard*, 50 Wn. App. 888, 894, 751 P.2d 339 (1988). In deciding whether a restitution order is within a trial court's statutory authority, we use a "but for" factual test to evaluate the causal link between the criminal acts and a victim's damages. *State v. Hunotte*, 69 Wn. App. 670, 676, 851 P.2d 694 (1993) (citing *State v. Blair*, 56 Wn. App. 209, 215, 783 P.2d 102 (1989)); *State v. Harrington*, 56 Wn. App. 176, 180, 782 P.2d 1101 (1989); *State v. Barrett*, 54 Wn. App. 178, 179, 773 P.2d 420 (1989).

¶52 In *State v. Johnson*, 69 Wn. App. 189, 190, 847 P.2d 960 (1993), a bookkeeper and office manager pleaded guilty to embezzling checks and currency from her employer. On appeal, the defendant challenged the portion of the restitution order that required her to pay expenses relating to the investigation of business records and goods she had stolen. *Johnson*, 69 Wn. App. at 190. The restitution figure included the cost of having various individuals, including an accountant, review the employer's business records, a cost the court held to be a reasonable consequence of the defendant's embezzling. *Johnson*, 69 Wn. App. at 192-93.

¶53 Like the costs in *Johnson*, but for Tobin's thefts, the WDFW would not have incurred the investigative and administrative costs. Thus, such costs are a reasonable consequence of Tobin's crimes.

¶54 Tobin is correct that Volz estimated the costs without attaching supporting documentation, such as time sheets or pay stubs. But Tobin did not object to the evidence on this basis below, and he has cited no rule that states evidence in restitution hearings must be supported by corroborating evidence. Volz's declaration was executed under penalty of perjury, and Tobin has presented no evidence to contradict Volz's estimations or to show that his declaration is unreliable.

4. Losses to Native American Tribes

¶55 Tobin argues that "[a]s made clear by the Squaxin Island Tribe memorandum, the State has no right to any geoducks taken within Squaxin fishing territory, thus it was error to include such geoducks in the restitution ordered to the State." Br. of Appellant at 13. In fact, the trial court did not consider the Squaxin Tribe memorandum when making the restitution order because it found the brief was not in proper form and was not timely filed. In general, an appellate court is confined to evidence and arguments presented to the trial court. *State v. Elmore*, 139 Wn.2d 250, 302, 985 P.2d 289 (1999) (citing *Erection Co. v. Dep't of Labor & Indus.*, 121 Wn. 2d 513, 522, 852 P.2d 288 (1993)); *Casco Co. v. Pub. Util. Dist. No. 1 of Thurston County*, 37 Wn.2d 777, 784-85, 226 P.2d 235 (1951). Accordingly, we decline to consider the Squaxin Tribe memorandum.

¶56 Regardless, Tobin has no standing to make the argument; he has not shown that he can assert the interests of the Native American Tribes. And even if he did have standing, a dispute about the distribution of the award is not ripe. Indeed, certain tribes have a right secured by federal treaty to harvest shellfish at their usual and accustomed fishing places. *See United States v. Washington*, 873 F. Supp. 1422, 1429 (W.D. Wash. 1994). But the

lower court's order did not violate this rule or award the value of tribal geoducks to the State alone; instead, the court awarded restitution to the DNR; the WDFW; and the Nisqually, Squaxin, and Puyallup Indian Tribes. The court specified that distribution of funds will be allocated "per negotiations of tribes and Dept. of Natural Resources," placing no restrictions on those allocations. CP (Oct. 12, 2004) at 78. It is up to the State and the tribes to distribute the damages according to their respective interests; the lower court did not interfere with the tribes' right to assert their treaty interests in *all* or a portion of the geoducks.

¶57 Affirmed.

HOUGHTON and HUNT, JJ., concur.