IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80159-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MARVIN BENSON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — After pleading guilty to two counts of first degree assault, Marvin Benson and his trial attorneys moved for the appointment of substitute counsel to address his request to withdraw the plea. Benson contends the trial court's refusal to appoint new counsel violated his right to the assistance of counsel at a critical stage of his proceedings. Because Benson and his attorneys failed to demonstrate an actual conflict of interest necessitating the appointment of new counsel, we affirm his conviction.

Benson further contends the trial court lacked substantial evidence to support its restitution order and erred in imposing Department of Corrections (DOC) community custody supervision fees. The State concedes error in the imposition of DOC community custody supervision fees. We accept this

Citations and pin cites are based on the Westlaw online version of the cited material.

concession and remand to strike these fees from the judgment and sentence. We otherwise reject his challenge to the restitution order.

FACTS

On December 13, 2017, Marvin Benson accompanied his friend, Kevin Alvarado, to a planned fight at the King County Aquatic Center.[1] During the fight, two 17-year-old brothers, A.K. and I.K., intervened and attempted to restrain Alvarado. Benson pulled a firearm with an extended magazine and shot A.K. and I.K. as they ran away. Both sustained life-threatening injuries and were taken to the hospital for medical treatment. One of the two was paralyzed by the gunshot wounds.

Benson pleaded guilty to two counts of assault in the first degree in March 2019. Under the plea agreement, the State agreed to recommend a mid-range sentence and to dismiss the firearm enhancements on both counts, thereby reducing Benson's potential prison term by 10 years. The State also agreed not to charge Benson with any further crimes stemming from the incident.

On April 26, 2019, at the scheduled sentencing hearing, Benson's attorneys, Kurt Bennett and Maxwell Boltinghouse, advised the trial court that Benson wished to withdraw his guilty plea. Benson claimed that, at the time of his plea, he was being threatened by other jail inmates, had been assaulted in the jail on at least two occasions, and was afraid of being injured. After he pleaded guilty, Benson was transferred to a different unit at the jail and was no longer frightened. Benson asked the trial court to continue the sentencing hearing and to appoint new

---

[1] The substantive facts have been taken from the certification for determination of probable cause, to which Benson stipulated in the plea agreement.

counsel to evaluate the voluntariness of his plea and to represent him in any motion to withdraw his plea.

When the court questioned Bennett why Benson needed a new attorney, Bennett stated "the basis before the Court may not be all the bases to withdraw the plea that new counsel may find" and that it would be "safest" to have new counsel. The trial court agreed to continue the sentencing hearing to give Benson and his attorneys time to discuss his options and the likely consequences of withdrawing the plea. While the court initially indicated a willingness to order the appointment of new counsel, it decided to hold off on doing so until Benson had the opportunity to consult with Bennett and Boltinghouse about the possible adverse consequences of withdrawing the guilty plea. The court indicated if Benson decided to move to withdraw the plea, it would entertain a motion for new counsel.

At a May 3, 2019, hearing, Benson confirmed he wanted the appointment of new counsel for the purpose of moving to withdraw his plea. The trial court asked why it should appoint new counsel when Benson had not alleged ineffective assistance of counsel. The court voiced concerns that Benson was deliberately delaying the case:

> I don't see why we need to spend months having another lawyer get up to speed on this case. It's not making any sense to me, and it's . . . also not making much sense to me that Mr. Benson's stated reason for wanting to withdraw his plea falls into one of the categories that the law allows for someone to withdraw his plea. When I couple that with the history of this case, which is continuance after continuance after continuance, and then a last-minute, what was deemed by the mental health evaluator to be feigned mental illness to avoid resolution of the case, whether it be by trial or by plea, I have concerns, and I am not terribly inclined, unless the law

- 3 -

requires it for some reason, to appoint new counsel and push this back by what sounds like it's going to be four to six months.

Bennett raised, for the first time, the possibility that a conflict of interest existed. Although Benson told the court the "main reason" he wanted to withdraw his guilty plea was because it was not voluntary, Bennett stated that "it's my position that I cannot make an assessment of whether I've been effective or ineffective," and that evaluation needed to be performed by other counsel, and that was one of two reasons for the request for the appointment of new counsel. The second reason, he stated, was that if new counsel believed there was a basis for claiming the plea was involuntary, then new counsel "may want to have I or Mr. Boltinghouse as a witness to that [e]ffect."

The court indicated that without some articulated basis for claiming ineffective assistance of counsel, the request for new counsel appeared to be "game playing" on Benson's part. Bennett reiterated his contention that under the Sixth Amendment, it was improper for a defendant's attorney to gauge his own effectiveness and that it needed to be outside counsel, but he conceded he had no authority to support this argument.

The trial court set a deadline by which Benson had to file any motion to withdraw the guilty plea. The court indicated a desire to give Benson the opportunity to present whatever evidence he wanted to present and to give counsel time to brief any legal issue they wanted to brief. The court set a hearing on the motion for May 20, 2019.

On May 8, 2019, Benson filed an emergency motion for reconsideration of his request for the appointment of new counsel, arguing that his attorneys had an actual conflict of interest. He argued

> [I]n order for undersigned counsel to be effective in representing Mr. Benson undersigned counsel would need to explore all reasonable avenues for achieving his stated goals – to wit: withdraw of his pleas of guilty. Such claims would include examination of undersigned counsel's own work to determine if counsel was ineffective. This is in addition to any voluntariness claims that Mr. Benson may have. This would include, by definition, evaluation and analysis of counsels' own conduct, decisions, and arguments. Evaluation of those aspects of representation cannot be done by undersigned counsel's office as it is an established ethical conflict. Such representation would result in competing interests for the attorney and serves as an actual conflict.

The trial court denied this motion because neither Benson nor his counsel had "cited any fact or any evidence suggesting that Mr. Benson's counsel had been ineffective in any way. Nor was any evidence cited that there were or are any conflicts of interest between Mr. Benson and his current counsel."

On May 14, 2019, Benson filed the motion to withdraw his guilty plea. Benson advanced two arguments. First, he claimed his plea was involuntary because it was the result of coercion. He argued that "specific threats of violence and specific acts of violence against Mr. Benson during the pendency of the plea proceeding resulted in duress and coercion. Such duress and coercion on the part of third parties, unaffiliated with the state, negated the voluntariness of Mr. Benson's decision to plead guilty." But, counsel argued, "in order to be an effective advocate, counsel will need to present evidence, in the form of testimony from counsel themselves related to communications and information that was conveyed related to these incidents of violence." The attorneys argued they were prohibited

by RPC 3.7 and 1.7 from acting as both an advocate for Benson and testifying as a witness in any evidentiary hearing relating to his motion to withdraw the guilty plea.

Second, Benson argued "there may be claims of ineffective assistance of counsel," but his lawyers could not ethically advance those claims. His attorneys asked to withdraw as Benson's attorneys and for the appointment of new counsel to address this possible claim.

To support the coercion claim, Bennett submitted a declaration in which he informed the court that on January 24, 2019, the prosecutor filed robbery charges against a man named Justin Henderson identifying Benson as the victim of this crime. He testified that Benson may also be a witness against Henderson and other inmates who were awaiting trial on additional criminal charges. Bennett stated that in February 2019, he learned Benson had been involved in two "incidents" in the jail involving other inmates. He met with Benson who "relayed to me information about the incidents . . . . Without being presently court ordered or released by Mr. Benson to provide information which is attorney-client privileged, at this time neither . . . Mr. Boltinghouse [nor I] can say [] more." Bennett reported he had brought concerns for Benson's safety to the attention of the Chief Criminal Presiding Judge who advised him to report his concerns to the jail, which Bennett did and he anticipated using his written communications as exhibits at the hearing on Benson's motion.

Bennett indicated that he intended to call himself and his co-counsel, Boltinghouse, as witnesses in the hearing on Benson's motion to withdraw the

plea. Bennett outlined the anticipated testimony as including "[c]ommunications with the King County Jail regarding the defendant and incidents of violence involving Marvin Benson and other inmates of the King County Jail." Bennett did not indicate, however, why these communications were material, why testimony from Benson's attorneys was necessary, and why the information they possessed was unavailable from other witnesses.

The State acknowledged Benson had been involved in two jail fights on January 17 and February 22, 2019. The State reported that the first fight appeared to have been "mutual," while Benson was the victim on the second incident. But the State contended the jail staff interviewed Benson and he had indicated, on seven different occasions, that he had no concerns about anything further happening in the jail. And the inmates involved in the fights did not include Justice Henderson. The State argued the coercion referenced in Benson's motion to withdraw was insufficient to overcome Benson's unequivocal statement on the record during the plea hearing that no one had threatened him to get him to enter the plea. The State further contended that Benson's claim of coercion was not credible, particularly in light of Benson's history of delaying the case, and a Western State Hospital psychiatric evaluation finding Benson to be malingering to avoid prosecution. The State finally argued Benson had presented no evidence that his attorneys had provided deficient representation.

On May 20, 2019, at the hearing set to consider Benson's motion to withdraw the guilty plea, Bennett renewed the request that new counsel be appointed. The court indicated it could not find a conflict of interest because

neither Benson nor his counsel ever identified the nature of the alleged conflict or proffered any facts establishing the possibility that such a conflict existed. The court determined that any assertion of a conflict was "purely speculative."

Benson's attorneys argued they could make no proffer because any facts they could identify were covered by the attorney-client privilege and independent counsel was needed to advise Benson on whether to waive that privilege. After some debate over how to proceed, the court requested, and Bennett agreed to submit for in camera review, written materials explaining the basis for the alleged conflict.

The trial court ordered Bennet to submit these materials by May 23, 2019, along with a motion to seal under Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 640 P.2d 716 (1982). The court scheduled a hearing for May 28, 2019 to render a ruling on the motion for substitute counsel after conducting this in camera review.[2]

On May 23, 2019, rather than file the expected offer of proof, Benson filed a "motion requesting in camera review and request for ruling." Benson's attorneys stated they could not comply with the court's order to present privileged communications for the in camera review. Counsel asked the trial court to decide whether a conflict existed without requiring them to submit any factual evidence.

At the May 28, 2019 hearing, the trial court found it had given Benson and his attorneys multiple opportunities to demonstrate that a conflict existed but "that absolutely no facts have been advanced that would allow the Court to find that there's a conflict of interest or that there's been ineffective assistance of counsel."

---

[2] The court entered an order documenting its ruling for the in camera review, but we do not have a copy of that order in the record before us.

The court further concluded Benson had failed to present any evidence that would allow it to conclude that a manifest injustice existed that would justify allowing Benson to withdraw his guilty plea. The court denied Benson's motion to withdraw his plea and scheduled a sentencing hearing.

The trial court subsequently sentenced Benson to 216 months of imprisonment followed by 36 months of community custody. The court ordered Benson to pay restitution in the amount of $390,273.17, comprised of the medical expenses the victims incurred as a result of their gunshot wounds and the lost or damaged clothing they were wearing on the night of the assaults.

ANALYSIS

A.    Denial of Benson's Request for Appointment of Substitute Counsel

Benson first argues that he was denied the right to effective assistance of counsel under the Sixth Amendment and Wash. Const. art. I, § 22 of the Washington constitution when the trial court refused to appoint substitute counsel to assist him with the motion to withdraw his guilty plea. We reject this argument because the mere possibility that Benson might have an ineffective assistance of counsel claim does not create an actual conflict of interest. And the record does not support the contention that an actual conflict of interest existed.

A defendant may withdraw a guilty plea if doing so is necessary to correct a "manifest injustice." State v. Watson, 63 Wn. App. 854, 856, 822 P.2d 327 (1992). A manifest injustice occurs when: (1) the defendant did not receive effective assistance of counsel before entering the plea, (2) the plea was not ratified by the defendant, (3) the plea was involuntary, or (4) the prosecution fails

to honor the plea agreement.  Id. at 857 (citing State v. Taylor, 83 Wn.2d 594, 597, 521 P.2d 699 (1974)).

The Sixth Amendment guarantees the right to effective assistance of counsel.  U.S. CONST. amend. VI; In re Pers. Restraint of Gomez, 180 Wn.2d 337, 348, 325 P.3d 142 (2014).  This right includes the right to conflict-free counsel at all critical stages of the prosecution.  State v. Robinson, 153 Wn.2d 689, 694, 107 P.3d 90 (2005).  A plea withdrawal hearing is a critical stage "giving rise to the right to assistance of counsel."  State v. Harell, 80 Wn. App. 802, 804, 911 P.2d 1034 (1996).

To establish a violation of the Sixth Amendment and art. I, § 22 based on a conflict of interest, a defendant must demonstrate that an actual conflict of interest adversely affected his lawyers' performance.  State v. Dhaliwal, 150 Wn.2d 559, 570, 79 P.3d 432 (2003); Gomez, 180 Wn.2d at 348; State v. Regan, 143 Wn. App. 419, 427, 177 P.3d 783 (2008).  The possibility of a conflict is not enough to warrant reversal of a conviction.  State v. Kitt, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019).  The defendant need not show prejudice, but must demonstrate the alleged conflict caused some lapse in representation contrary to the defendant's interests, or that it likely affected particular aspects of counsel's advocacy on behalf of the defendant.  Regan, 143 Wn. App. at 428.

An actual conflict of interest exists when a defense attorney owes duties to a person whose interests are adverse to those of the defendant.  Kitt, 9 Wn. App. 2d at 244.  Under RPC 1.7(a)(2), an actual conflict exists if there is a significant risk that the client's representation will be materially limited by the lawyer's

- 10 -

responsibilities to a third person or the lawyer's personal interests.  The alleged conflict must be more than a "mere theoretical division of loyalties."  Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002).

We review a trial court's decision on a motion to substitute counsel for an abuse of discretion.  Kitt, 9 Wn. App. 2d at 243.  But whether the circumstances demonstrate a conflict under ethical rules is a question of law we review de novo. Regan, 143 Wn. App. at 428.

Benson argues he may have had a basis for challenging the adequacy of his attorneys' legal representation and needed independent representation to conduct this analysis.  He relies on United States v. Del Muro, 87 F.3d 1078, 1080 (9th Cir. 1996) for the proposition that there is an actual conflict any time trial counsel is required to evaluate their own ineffectiveness.  Washington courts, however, have declined to adopt a rule that requires new counsel to be appointed whenever a defendant expresses a desire to claim ineffective assistance of counsel.  See State v. Stark, 48 Wn. App. 245, 253, 738 P.2d 684 (1987) ("[I]f a defendant could force the appointment of substitute counsel simply by expressing a desire to raise a claim of ineffective assistance of counsel, then the defendant could do so whenever he wished, for whatever reason."); State v. Rosborough, 62 Wn. App. 341, 346, 814 P.2d 679 (1991) (concluding that a defendant's allegation of ineffective assistance of counsel does not create an inherent conflict of interest automatically requiring the court to appoint substitute counsel). The possibility that a defendant may claim ineffective assistance of counsel is an insufficient basis to find an actual conflict of interest.

- 11 -

Moreover, while Bensons' attorneys insisted they had an actual conflict of interest, the record does not support this conclusion. When Benson first raised the issue of withdrawing his plea, he alleged he had been coerced by threats from other inmates. Benson never claimed his attorneys failed to adequately advise him about any particular aspect of the plea. He never contended counsel failed to investigate the charges or possible defenses before he entered the plea. He never alleged his attorneys pressured him into pleading guilty or disregarded his wishes in recommending he accept the State's plea offer. [3]

As Benson notes, a trial court has a duty to investigate a potential conflict of interest when it knows or reasonably should know of a conflict of interest between counsel and their client. Regan, 143 Wn. App. at 425-46. When alerted to a potential conflict, the trial court must appoint substitute counsel or take "adequate steps" to determine whether the risk of a conflict of interest is too remote to require substitute counsel. Holloway v. Arkansas, 435 U.S. 475, 484, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). And reversal is required if a defendant or his attorney makes a timely objection because of a claimed conflict and the trial court fails to conduct an adequate injury. Id. at 488.

But the trial court here tried to determine the basis for the alleged conflict. Regan is instructive here. In that case, an out-of-custody defendant failed to appear for trial and the trial court issued a bench warrant for his arrest. Id. at 424. The State was permitted to amend the information to add a bail jumping charge.

---

[3] Benson relies on State v. Irish, noted at 186 Wn. App. 1040 (2015), an unpublished decision, but we conclude that a discussion of that case is not necessary here, and thus do not address it. See GR 14.1(c).

Id. The State then sought to call one of the defendant's two attorneys to prove that the defendant knew of his trial date and had been instructed by the attorney to arrive early for trial. Id. The attorney objected to having to act as a witness against his client but the trial court concluded the attorney's communication with the defendant was not privileged and ordered him to testify. Id. at 425. The State requested a trial continuance because the attorney, the supervisor of Regan's trial counsel, had a pre-scheduled vacation. Regan's trial counsel informed the court that this motion put her in a dilemma because if she agreed to the continuance to accommodate her supervisor's vacation, it would result in the extension of her client's pretrial detention and her client wanted to proceed to trial immediately. Id. at 429.

This court held that, once on notice that Regan's trial attorney had to make a decision regarding whether to object to a trial continuance based on a conflict between her supervisor's vacation schedule and her client's desire to proceed to trial, the trial court erred in failing to conduct an inquiry into whether there were other witnesses available to provide the evidence the State sought to elicit from Regan's attorney. Id. at 430.

Unlike in Regan, the record here fails to show that the trial court was on notice of any similar conflict confronting Benson's attorneys. While counsel indicated they would need to testify regarding Benson's claim of coercion, the trial court stated:

> I don't understand what you all would be testifying to. And, frankly, I don't know why you need to call witnesses. Most of the facts that you assert in your brief are not contested. The only thing that was contested, and you don't have any direct knowledge of that, is exactly

- 13 -

> what the jail records are with respect to what occurred at the jail between Mr. Benson and other inmates and what steps were taken by the jail as a response to those incidents and neither of the lawyers knows – has any direct knowledge about that.

In response, Bennett stated "As to what I would testify to, that's where things get ethically dicey." It was at that point the trial court ordered counsel to submit a declaration identifying facts that might establish a possible conflict for the court's in-camera review. The attorneys initially agreed to comply, but then claimed they could not ethically do so.

Benson argues that his defense attorneys' representation was materially limited because they could not explain the nature of the conflict without revealing information protected by the attorney-client privilege. Because of this situation, Benson maintains, the trial court was "not able to inquire further as to the nature of the conflict" as required by Holloway and Regan, and "its only available option was to appoint new, conflict-free counsel." We disagree.

Motions for substitute counsel based on a conflict of interest are not uncommon in criminal cases. CrR 3.1(e) requires a defendant to provide a "good and sufficient reason" for discharging existing counsel and appointing new counsel. See State v. Staten, 60 Wn. App. 163, 802 P.2d 1384 (1991). A conflict of interest is a recognized basis under CrR 3.1(e) for a finding of good cause to allow counsel to withdraw. See State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997); State v. McDonald, 96 Wn. App. 311, 320, 979 P.2d 857 (1999).

But a trial court is not required to accept defense counsel's representation that a conflict of interest exists and asking counsel to provide a general description of the conflict does not put counsel at risk of violating the Rules of Professional

Conduct. RPC 1.6(a) provides that lawyers may not reveal information relating to their representation of a client unless that disclosure is permitted by RPC 1.6(b). Under RPC 1.6(b)(6), attorneys may reveal information relating to that representation to comply with a court order. A court order requiring Bennett to disclose information to establish a conflict of interest, as required by CrR 3.1(e), would have been permissible under the RPCs and would not have required Benson to waive the privilege. Revealing attorney-client communications to the court for an in camera review to evaluate the existence of a conflict of interest would not have constituted a waiver of Benson's attorney-client privilege. See United States v. Zolin, 491 U.S. 554, 568, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) (disclosure of discovery for the purpose of determining the merits of a claim of privilege does not effect a waiver); Transamerica Computer Co. v. International Business Machines Corp., 573 F.2d 646, 650-51 (9th Cir. 1978) (attorney-client privilege is not waived for documents that a party is judicially compelled to produce); Cobell v. Norton, 213 F.R.D. 69, 75 (D.D.C. 2003) (no waiver of the privilege where a monitor obtained confidential memoranda for in camera review under the authority of a court order); Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co., 951 F. Supp. 679, 688 (W.D. Mich. 1996) (submitting privileged report for in camera review did not waive attorney-client privilege).

Because Benson's attorneys could have disclosed attorney-client privileged information without any adverse impact on Benson but failed to do so, the trial court had no factual basis for concluding a conflict existed. The court did not abuse its discretion in concluding that the attorneys' steadfast refusal to support their

assertion of a conflict was mere gamesmanship, to perhaps set up a future ineffective assistance of counsel claim, and not a well-founded ethical dilemma.

Benson analogizes his case to State v. Chavez, 162 Wn. App. 431, 257 P.3d 1114 (2011) and State v. Harell, 80 Wn. App. 802, 911 P.2d 1034 (1996) to argue he was denied representation at his post-plea hearings. Neither case, however, is analogous.

In Chavez, the defendant contended he was denied counsel because his first attorney had a conflict of interest that made it impossible to give objective advice on whether to plead guilty and his second attorney, appointed to present him in withdrawing the plea, failed to provide any representation by filing an Anders[4] brief in which he suggested Chavez's position was frivolous. 162 Wn. App. at 434, 436. Chavez's first attorney moved to withdraw asserting the existence of a conflict of interest but the court made no findings of fact as to why the attorney had reached this conclusion. Id. at 438. Chavez's substitute counsel undertook no investigation into whether an actual conflict existed or whether it affected Chavez's decision to plead guilty. Id. at 439. This court concluded that, in light of the first attorney's admission that a conflict existed, the substitute counsel's failure to investigate the existence of the conflict, and his submission of an Anders brief—an appellate procedure not appropriate for a trial court— amounted to a complete denial of counsel at a critical stage of the proceeding. Id. at 439.

---

[4] Anders v. California, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

Chavez is distinguishable because Benson's attorneys did not contend they had a conflict of interest at the time Benson pleaded guilty. And they never represented to the trial court that Benson's motion to withdraw the guilty plea was frivolous or factually unfounded. His attorneys, in fact, argued the opposite. And Chavez did not involve a situation where the trial court requested an offer of proof to demonstrate the existence of a conflict of interest and counsel refused to provide one.

In Harell, the defendant moved to withdraw his guilty plea based on an allegation that his counsel had rendered ineffective assistance during the plea bargaining process. 80 Wn. App. at 803. His attorney declined to assist him with his motion and, during the evidentiary hearing on the motion, testified as a witness for the State. Id. at 805. This court held the defendant's right to counsel was violated because he had to act pro se at the post-plea hearing and his appointed attorney had a direct conflict of interest, evidence by his direct testimony against Harell's interest at the hearing. Id.

Harell is also readily distinguishable. Benson's attorneys did not refuse to assist Benson in advocating for the withdrawal of the guilty plea. They did not force Benson to proceed pro se. They did not testify for the State in opposition to Benson's motion and never indicated that their testimony was material, necessary, or adverse to Benson.

The trial court did not err in concluding Benson failed to show the existence of an actual conflict of interest and did not abuse its discretion in denying Benson's motion to appoint substitute counsel.

B.     Restitution

Benson next challenges the restitution order, arguing it was not based on substantial evidence. We reject this argument as well.

The authority to impose restitution is statutory. State v. Griffith, 164 Wn.2d 960, 965, 195 P.3d 506 (2008). RCW 9.94A.753(3) provides that "restitution ordered by a court pursuant to a criminal conviction shall be based on easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury." "Easily ascertainable damages" are tangible damages supported by sufficient evidence. State v. Tobin, 132 Wn. App. 161, 173, 130 P.3d 426 (2006). The claimed loss "need not be established with specific accuracy," but it must be supported by "substantial credible evidence." Griffith, 164 Wn. 2d at 965 "Evidence supporting restitution 'is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.'" Id. (quoting State v. Hughes, 154 Wn.2d 118, 154, 110 P.3d 192 (2005)). The State bears the burden of proving restitution by a preponderance of the evidence. Id. We review for abuse of discretion the amount of a restitution award. Id. We review a trial court's factual findings for substantial evidence. Id.

Benson first argues the court's imposition of restitution for the victim's medical bills was based on conjecture, rather than on substantial credible evidence, because the State did not provide the court with "any evidence of the extent of the injuries or the necessary treatment provided, nor did it provide testimony to decipher and explain the [insurer's expense] ledgers" or treatment

- 18 -

codes. But the extent of Benson's victims' injuries was well-documented in the record before the trial court and the insurer's letter and accompanying ledger are sufficient evidence that the treatment was causally connected to the assault.

The record indicates Benson shot both victims multiple times and they both required extensive medical treatment as a result. In his plea agreement, Benson admitted shooting the victims and causing them serious bodily injury. He further stipulated that the facts included in the probable cause certification could be used by the trial court in sentencing. The probable cause certification indicated police recovered 29 shell casings from the scene of the crime. One of the victims reported he could not feel his legs as medics worked on him at the scene and he is now paralyzed, with a bullet lodged in his spine. The mother of the victims indicated in her victim impact statement that the victims were in the ICU for several weeks.

The State demonstrated a sufficient causal nexus between those severe injuries and the subsequent medical treatment the victims received. The State submitted an itemized ledger from the Community Health Plan of Washington detailing the cost, diagnostic code, name of the provider, and date of service for each medical procedure. The dates from the charges in the ledger correspond to the date of the assault and the period of the victims' hospitalization – December 13, 2017 to January 4, 2018 for A.K. and December 13, 2017 to June 25, 2018 for I.K. Furthermore, the insurer submitted a letter accompanying the ledger, indicating that it determined which medical expenses resulted from the assault and any necessary follow-up care. We conclude this evidence substantiates the trial

court's finding that the expenses incurred were the "actual expenses incurred for treatment for injury to persons" as required by RCW 9.94A.753(3). The trial court thus did not abuse its discretion in ordering Benson to pay these expenses as restitution.

Next, Benson contends the amount the trial court imposed as restitution for the victims' lost or damaged clothing was not supported by substantial evidence. We reject this argument as well because there is substantial evidence in the record supporting the trial court's decision.

The trial court found that each of the clothing items included in the restitution request was damaged or destroyed "as a result of providing emergency aid" to the victims. This finding is supported by substantial evidence. In a sworn victim impact statement, the victims' mother informed the court that the boys' jeans, shirts, and jackets all had to be cut off by emergency medical technicians while administering medical care after Benson shot the boys.

The trial court also found that the lost clothing included a jacket valued at $100, a shirt valued at $30, and blue jeans valued at $50, for a total of $180. This finding is also supported by substantial evidence. The victim impact statement certified that each boy lost a pair of True Religion Jeans, valued at $179, and Tommy Hilfiger T-shirts, valued at $29.50. The losses were supported by internet advertisements indicating replacement costs for these items. The victim impact statement also indicated the victims were wearing Tommy Hilfiger puffer jackets, valued at $100, which was supported by an online advertisement for a preowned/used version of the same jacket. The court accepted this evidence, with

the exception of the value of the jeans, to which the court made a downward adjustment to an amount it deemed more reasonable. Not only did Benson benefit from this adjustment, it appears the trial court ordered restitution for clothing worn by only one of the two victims. We conclude the trial court did not abuse its discretion in setting restitution.

C.     DOC Community Custody Supervision Fees

Benson argues, and the State concedes, the trial court erred in imposing DOC community custody supervision fees. Because Benson was indigent at the time of sentencing, the court indicated it would "waive any non-mandatory financial penalties." The judgment and sentence, however, includes a provision requiring Benson to "[p]ay supervision fees as determined by the Department of Corrections." Because the trial court intended to impose only mandatory legal financial obligations, we remand to allow the court to strike the DOC community custody supervision fees. See State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (2020) (remand appropriate to strike community custody fees when trial court intended to impose only mandatory LFOs).

We affirm but remand for the sole purpose of striking the DOC community custody supervision fees from the judgment and sentence.

Andrus, A.C.J.

WE CONCUR:

Mann, C.J.                                  Leach, J.

- 21 -